**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| MICHAEL SHIRLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 2:15cv346-WHA |
| v. | ) | (wo) |
| | ) | |
| HYUNDAI MOTOR MANUFACTURING | ) | |
| ALABAMA, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. INTRODUCTION**

This case is before the court on a Motion for Summary Judgment (Doc. #13), filed by

Hyundai Motor Manufacturing Alabama, LLC on April 1, 2016.

The Plaintiff filed a Complaint in this case on May 21, 2015, bringing a claim of race

discrimination in the terms and conditions of his employment in violation of Title VII of the Civil

Rights Act of 1964, as amended, and 42 U.S.C. §1981.

For the reasons to be discussed, the Motion for Summary Judgment is due to be DENIED.

**II.   SUMMARY JUDGMENT STANDARD**

Summary judgment is proper "if there is no genuine issue as to any material fact and . . . the

moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986).

The party asking for summary judgment "always bears the initial responsibility of

informing the district court of the basis for its motion," relying on submissions "which it believes

demonstrate the absence of a genuine issue of material fact." *Id.* at 323.   Once the moving party

has met its burden, the nonmoving party must "go beyond the pleadings" and show that there is a genuine issue for trial. *Id.* at 324.

Both the party "asserting that a fact cannot be," and a party asserting that a fact is genuinely disputed, must support their assertions by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56 (c)(1)(A),(B).   Acceptable materials under Rule 56(c)(1)(A) include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials.

To avoid summary judgment, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   On the other hand, the evidence of the nonmovant must be believed and all justifiable inferences must be drawn in its favor. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

After the nonmoving party has responded to the motion for summary judgment, the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.   Fed. R. Civ. P. 56(a).

### III. FACTS

The submissions of the parties establish the following facts, construed in a light most favorable to the non-movant:

The Plaintiff, Michael Shirley ("Shirley"), is Caucasian.   He began working at the Defendant, Hyundai Motor Manufacturing Alabama, LLC ("Hyundai"), in 2004.   In 2013, he was promoted from the position of Team Member to Team Leader.   As Team Leader, he had about twenty people working under him. He was Team Leader in "light repair," a team in the Pre-Delivery Inspection or "PDI" department of the plant. PDI makes fixes and repairs to the vehicles after being assembled.   The light repair team makes certain repairs to the vehicles. Repairs done while the vehicles are on the production line are called "online repairs," and repairs done when the vehicles are taken off the production line are called "offline repairs." Mike Lashley ("Lashley"), a Caucasian employee, was the Assistant Manager over PDI for Shirley's shift.

In April of 2014, Lashley was notified of training that would be taking place the next day. Lashley told the Team Leaders to bring the people from their team to the training. There is a dispute as to what Lashley's directions were. Shirley has stated in his deposition that he was told to choose five team members. (Doc. #15-1 at p. 94:18-20). He was also told to send employees who were doing off-line repair   (Doc. # 81:18-19).   Shirley also testified that Lashley told him he wanted employees in First Time Through ("FTT"), done in light repair, to attend the training. (Doc. #123:19-20).[1]   Shirley has testified that he chose the employees under him who were doing offline repairs and who were doing FTT.   Included in this were a Hispanic employee and an African-American employee named Desmond Lowe ("Lowe").   Lowe, however, was not going to

---

[1]   Hyundai repeatedly informs the court that other attendees at the meeting at which instructions were given do not remember these limiting instructions. (Doc. #22 at p.3).   At the summary judgment, stage, however, the court is not allowed to weigh evidence or make credibility determinations, but instead must accept as true the testimony of the non-movant. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986); *Galvez v. Bruce*, 522 F.3d 1238, 1243 & n.5 (11th Cir. 2008) ("We have repeatedly said that 'facts, as accepted at the summary judgment stage of the proceedings, may not be actual facts of the case.'").

be at work the day of the training.   Shirley testified that he asked Lashley whom else he should bring instead of Lowe and Lashley told him to send John Rye ("Rye"), a Caucasian employee. (Doc. #15-1 at p.82:6-10). Shirley had other African-American Team Members, including Curtis McWaine and Soloman Rivers, who were not invited to participate.

Other shifts sent all of their Team Members to the training.   Bobby Cox, another Team Leader, sent fewer than five Team Members. (Doc. #15-1 at p.124:5-21).

After the training, Danielle Jackson, an African-American employee on Shirley's team, complained to Hyundai's Team Relations Department that she had been discriminated against because Shirley sent only Caucasians to training and excluded African-Americans.   Jackson was not doing offline repairs.

Barry Jackson ("Jackson"), Assistant Manager in Team Relations, assigned Specialists Sheila King ("King"), a Caucasian employee, and Will Ware ("Ware"), an African-American employee, to investigate Jackson's complaint against Shirley. Ware and King interviewed Jackson, Shirley, Lashley, Group Leader Chris Fletcher, and members of Shirley's team.

Ware testified in his deposition that the role of the investigators is to get statements from employees if there are two different accounts, but if someone corroborates an account "usually, I would say this was confirmed by so and so and this was not confirmed by so and so."   (Doc. #17-6 at p.13:6-9).[2] When pressed about how he reached a conclusion when there were conflicting accounts, Ware answered, "I guess my answer would be, I'm not in the decision-making role." (Doc. #17-6 at p.12:6-19).

Shirley gave a statement to the investigators in which he told them that he had been

---

2   In referring to page numbers of depositions, the court has used the document number appearing in the court's electronic filing system, but has used the internal deposition page and line designations.

instructed to send only five team members, that he had selected Lowe, and other factual information. Shirley also testified in his deposition that he reported to the investigators that employee Bobby Cox ("Cox") only sent African-American team members to training. (Doc. #15-1 at p.112:11-113:2).   In a statement given to investigators Ware and King by employee John Rye ("Rye"), the following is noted, "Desmond told John that he was one of the ones asked." (Doc. #16-1 at p.93).

After the interviews, Ware drafted a Team Relations Memo regarding Jackson's complaint against Shirley.   King did not have any input in drafting the memo.   King did read the memo before it was submitted and she did not disagree with any of the conclusions in it.   (Doc. #17-7 at p.19:16-21).   The memo did not make a recommendation, but did make factual findings.   In the factual recitation portion, the memo states, "Mike also indicated that he asked TM Desmond Lowe (101361 African American) to come in and was informed that Desmond 'D-Lowe' was going to call out on Friday; therefore, he went to John Rye. (Desmond stated that Mike S. never asked him about attending the training)." (Doc. #16-1 at p.114).   In the "Conclusions" portion, the memo states, "Mike S. did not ask Desmond Lowe (African American TM) to attend training as he stated in his statement. (confirmed by Desmond Lowe)."   (Doc. #16-1 at p.120).   The Conclusions portion also states, "[i]t was confirmed that Mike asked all the Caucasian TMs on the Team with the exception of Jeffery Steward who was in Korea at the time to attend the training. (TR verified TMs photos in SAP)". (Doc. #16-1 at p.121).

Jackson reviewed the Team Relations Memo, and put his name on it.   The memo then went up the chain-of-command.   Kelly Rucker ("Rucker") was the head of the Human Resources Department, the head of the disciplinary committee, and the final decision-maker for discipline of employees at the assistant manager level and below.   Rucker made the decision to demote Shirley

based on the Team Relations Memo.

On May 14, 2014, Shirley was presented with a Corrective Action—Serious Misconduct and Letter of Conditional Employment.   The letter stated

> On Thursday, April 24, 2014, you instructed [sic] by your Group Leader to inform
> Team Members on your team to come in early the next morning for training.
> You however went and selected Team Member to come in the next morning for the
> Training.   All of the Team Members whom you selected were Caucasian, with no
> African American Team Members being selected.   Your action is considered a
> violation of HMMA's Anti-Harassment Policy.

(Doc. #16-1 at p.123).   Shirley was demoted from Team Leader to Team Member, resulting in a pay-cut of about a dollar an hour. (Doc. #16-1 at p.123).

## IV. DISCUSSION

Where, as here, the plaintiff seeks to prove intentional discrimination on the basis of race under Title VII and § 1981 by using circumstantial evidence of intent, the court applies the framework first set out by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[3]   Under this framework, the plaintiff must establish a prima facie case of discrimination.   *McDonnell Douglas*, 411 U.S. at 802.   After the plaintiff has established a prima facie case of discrimination, the burden of production is placed upon the employer to articulate a legitimate nondiscriminatory reason for its employment action.   *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).   The plaintiff may seek to demonstrate that the proffered reason was not the true reason for the employment decision "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the

---

3 Shirley contends that he has both a race discrimination claim, analyzed through traditional burden shifting, and a mixed-motive claim.   Hyundai does not appear to address the mixed-motive claim. For reasons to be discussed, the summary judgment motion is due to be DENIED as to the traditional burden-shifting claim, therefore, whether the alternative theory is one which will be advanced at trial is an issue to be taken up in other pre-trial motions.

employer's proffered explanation is unworthy of credence." *Id.* at 256; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997).   A plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.   *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000).   That is, even if a plaintiff establishes a prima facie case and offers sufficient evidence of pretext as to each of the proffered reasons, summary judgment "will sometimes be available to an employer in such a case."   *Chapman v. AI Transport*, 229 F.3d 1012, 125 n.11 (11th Cir. 2000).

When a plaintiff alleges discriminatory discipline, the plaintiff "must show either (a) that he did not violate the work rule, or (b) that he engaged in misconduct similar to that of a person outside the protected class, and that the disciplinary measures enforced against him were more severe than those enforced against the other persons who engaged in similar misconduct." *Jones v. Gerwens,* 874 F.2d 1534, 1540 (11th Cir.1989); *Winborn v. Supreme Beverage Co*., 572 Fed. App'x 672 (11th Cir. 2014).[4]   When an employee argues that he did not actually violate the rule in question, "an employer may rebut this allegation by showing its good faith, honest belief that the employee violated [the] rule." *Winborn*, 572 F. App'x at 674.   If an employer terminates an employee "because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race.' "   *Id.* (quoting *Smith v. Papp*

---

4  Through the years, different courts have discussed the first avenue of establishing a prima facie case and whether a comparator must be shown. *Mack v. Colorworks Painting Co., LLC*, __ F. Supp. 3d __, 2015 WL 6170659 (N.D. Ala. Oct. 21, 2015).   The Eleventh Circuit, however, has also made it clear that "the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case."   *Smith v. Lockheed-Martin Corp*., 644 F.3d 1321, 1328 (11th Cir. 2011). This court, therefore, will follow the formulation set out by the Eleventh Circuit in the unpublished *Winborn v. Supreme Beverage Co. Inc.,* 572 F. App'x 672, 674 (11th Cir. 2014) opinion.   The Defendant does not dispute this application of the prima facie case analysis.

*Clinic, P.A.*, 808 F.2d 1449, 1452–53 (11th Cir.1987)).   If a plaintiff establishes a prima facie case of discrimination in application of the work rule, the plaintiff can also demonstrate that reliance on the work rule violation as a reason for an adverse employment action is pretext by showing either that the plaintiff did not violate the work rule or that employees not within the protected class who engaged in similar acts were not similarly treated. *Id.* at 675.   When evaluating pretext, the inquiry is whether the employer believed that the employee was guilty of the misconduct and whether the belief was the reason for the adverse action. *Id.*

   Shirley has presented evidence to create a question of fact as to whether he violated the work rule, i.e., Hyundai's Anti-Harassment Policy.[5] He has presented his deposition testimony that his supervisor, Lashley, told him to bring five employees to training, not his entire team; that Lashley told him only employees doing offline repairs should go to training; that Shirley asked Lowe, an African-American, to go to training; and when Shirley found out that Lowe could not attend, Lashley told Shirley to send John Rye, a Caucasian, to training. (Doc. #15-1 at p. 81:5-19; 82:7-10; 95:1-20).[6]

   Shirley recognizes that these questions of fact are not in themselves sufficient to establish a prima facie case because the evidence supports that Rucker, who made the disciplinary decision, relied on the Team Relations Memo.   Shirley's argument, however, is that while Rucker's decision was based on the Team Relations Memo, that Team Relations Memo was drafted by Ware and adopted by King, and Ware did not have an honest, good faith belief that Shirley violated the work rule, and in fact acted based on racial animus.

---

5 Shirley does not argue that a comparator was similarly-situated for prima facie case purposes.
6 At various points, Hyundai has argued that Shirley's testimony is not to be accepted because it is contradicted by other testimony or does not make sense. (Doc. #22 at p.5). This court, however, must accept Shirley's testimony as true, and view all evidence in a light most favorable to Shirley as the non-movant.

Shirley seeks to rely on a "cat's paw" theory to show that the employer did not honestly believe that he violated a work rule.   *See Llampallas v. Mini-Circuits, Lab, Inc.*, 163 F.3d 1236, 1249 (11th Cir. 1998).   A "cat's paw" theory applies "when a biased actor recommends that an adverse employment action be taken against an employee, but the biased actor is not the ultimate decision-maker."   *Stimpson v. City of Tuscaloosa*, 186 F.3d 1328, 1332 (11th Cir. 1999).   In such a situation, there must be evidence that the alleged discriminatory animus directly caused the decision-maker to take the adverse employment action.   *Id.* at 1331.

Hyundai questions whether it is appropriate to apply a "cat's paw" theory in this case because Ware was not a supervisor and did not make a recommendation for an adverse employment action, but instead merely issued a report which contained fact-findings which ultimately was relied upon by Rucker.   The Eleventh Circuit has indicated, however, that participation in the decision-making process by a biased individual can be relevant even if the participation is not a recommendation.   *See Roberts v. Randstad N. Am., Inc*., 231 F. App'x 890, 893, 896 (11th Cir. 2007) (noting that subordinate did not recommend termination of the plaintiff but provided information about the employee).   This court cannot conclude, therefore, that the cat's paw theory cannot apply to this instance where a person charged with the investigation of an allegation makes findings relied on by the decision-maker.

Shirley points to Rucker's deposition testimony when he was asked what role the Team Relations Memo played in the decision to demote Shirley and he answered, "[t]his was what I used to base my decision on." (Doc. #16-3 at p. 21:5-7).   The court, therefore, will apply the "cat's paw" analysis in this case.

Merely because facts in dispute were relied on by Ware and King,[7] is not a sufficient basis for imputing racial animus, however.   And, while a "cat's paw" theory can be successful when the subordinate employee providing information has made race-based derogatory remarks, *see Williams v. Ala. Dept. of Transp.*, 509 F. Supp. 2d 1046, 1057 (M.D. Ala. 2007), there is no evidence of racial remarks by Ware or King in this case.

The Eleventh Circuit, in an unpublished opinion, has given courts guidance on how to proceed where, as here, there is no direct evidence of racial animus in a "cat's paw" theory case. *See Williamson v. Adventist Health System/Sunbelt, Inc.*, 372 F. App'x 936 (11th Cir. 2010).   In *Williamson*, a plaintiff argued that discriminatory decisions made at two hospitals could be imputed under a "cat's paw" theory to the parent company.   The Eleventh Circuit explained that even if the ultimate decision-maker passively acceded to the decisions of the subsidiaries, the "essence of a 'cat's paw' theory" required the plaintiff to establish that those subsidiaries discriminated against the plaintiff.   *Id.* at 939.   The Eleventh Circuit applied traditional *McDonnell Douglas* analysis to the underlying decisions of the subsidiaries. *Id. Williamson*, of course, involved employment decisions made by subordinates which were attributed to an ultimate decision-maker through a "cat's paw" theory, which makes that case slightly different from this one involving an investigation with findings, but the principle of actions based on race affecting an ultimate outcome is the same.

Shirley argues that an inference can be drawn that Ware acted based on racial animus based on the following:   when Ware interviewed Shirley he accused him of selecting only Caucasians

---

7 Hyundai argues that Shirley cannot limit the analysis to only Ware, as King also participated in the investigation and agreed with the findings in the report. King, however, agreed with the findings of the report, and it is apparently undisputed that it was Ware who decided what facts would be stated in the report.

for the training, rather than acting in a neutral manner; Jimmy Navidad, who is Hispanic, was selected for training; Ware acted inconsistently by resolving a fact against Shirley even though there were two people who said that Shirley had asked Lowe to go to training; Ware omitted any reference in the report to a statement by Rye that Lowe had told him that Shirley had asked Lowe to attend the training; and Ware did not inquire into Cox's failure to send any Caucasian employees to training.

Hyundai responds to the five factors cited by Shirley and argues that they are not indicative of racial animus. Hyundai then argues that Shirley's arguments and evidence could possibly serve as the basis for a "cat's paw" theory if the court were to accept that the "issue of whether any non-Caucasians were invited," (Doc. #22 at p.12) is the relevant issue. Hyundai contends, however, that causation cannot be established because Rucker's determination was not so-limited. Hyundai points out that Rucker testified regarding Ware's findings as follows: "[i]f you go back to the conclusion page. So, you know, the main part was the fact that other African-American team members were not selected for training, and also the fact that it was too many different versions. And his group leader did not back him up in this case, because he indicated that his group leader told him to do something, and then the group leader did not agree with that." (Doc. #16-3 at p.23:5-18). Hyundai argues that in Rucker's view it was significant that "numerous qualified African-American Team Members (such as Curtis McWaine and Solomon Rivers) were not invited to the training program." (Doc. #22 at p.12).

The court agrees that the causation element is crucial in this case. Because there is no recommendation by a subordinate, for the "cat's paw" theory to apply in this case the evidence of causation must support that the decision-maker relied on the information reported by the subordinate in making the adverse employment decision. *See Stimpson*, 186 F.3d at 1331.

The court also concludes, however, that Rucker's deposition testimony is subject to interpretation.   At another point in his deposition, Rucker was asked about his reasons for discipline of Shirley and said Shirley had chosen "all Caucasian males." (Doc. #16-3 at p.30: 12-31:5).   Rucker's testimony is consistent with the reason given in the documentary evidence, the Letter of Conditional Employment, that "no African American Team Members were selected." (Doc. #16-1).   The difference between Hyundai's interpretation that Rucker thought it was significant that "numerous" African-Americans could have gone to training, or an interpretation, supported by the documentary evidence, that the reason for discipline was that "no" African Americans were selected for training is significant in this case, and this fact issue cannot be resolved adversely to Shirley, the non-movant, in ruling on a motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

Accepting, as the court must, the interpretation that Rucker relied on a finding that no African-Americans were selected for training, the documentary evidence submitted to the court of the statements given to Ware and King in their investigation reveals that in his statement to Ware and King, Rye stated that Lowe told him that Lowe, an African-American employee, was one of the people asked to go to training.   (Doc. #16-1 at p.93).   When asked about Rye's statement, Ware testified in his deposition that he did not include this information in coming to his conclusions because Lowe denied ever being asked. (Doc. #17-6 p.33:2-23).   When asked whether this was a fact that went to the heart of what he was investigating, Ware stated, "I would say, I would say, yes, it would have, it could have, it could have helped, well, once again, it was secondhand information, that's true."   (Doc. #17-6 at p.36:4-14).   When asked why he omitted Rye's statement he answered, "I can't say why." (Doc. #17-6 at p.37: 1-6).   When asked about his

procedures in drawing conclusion in his reports, Ware testified "usually, I would say this was confirmed by so and so and this was not confirmed by so and so." (Doc. #17-6 at p.13:6-9).

An employer's deviation from its own standard procedures may serve as evidence of pretext. *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1299 (11th Cir. 2006). Ware's omission of Rye's statement which corroborated Shirley's version of the events, and his testimony that usually he would have stated if a fact was confirmed, supports a finding that Ware did not follow his procedures when he resolved the fact issue in favor of Lowe and omitted Rye's confirmation of Shirley's version of the events.   When resolving another fact issue as between Shirley and Lashley, Ware stated that did not attempt to decide who was telling the truth, but on this crucial fact, he sided with Lowe, whose side was not corroborated.   And, rather than note Rye's statement, even though Ware's statement of facts was lengthy, he omitted any mention of Rye's statement that Lowe told him that Shirley had asked Lowe to attend the training.   Ware offered no real explanation for these departures.   Although Rucker also mentioned in reciting the reasons for the discipline that Lashley did not back-up Shirley's version of the events, there is insufficient evidence from which to conclude that Rucker would have made the decision to discipline Shirley in the absence of the Team Relations Memo finding that no African-Americans had been invited to training.

The court is aware that Hyundai disputes many of the facts upon which the "cat's paw" theory rests in this case.   It is not the court's role at the summary judgment stage to resolve factual disputes.   Evidence has been presented that the report prepared by Ware, and approved by King, included adverse fact-findings which were relied upon in the decision to discipline Shirley.   One of those facts, that an African-American employee had not been asked to attend training, was found contrary to Shirley's statement to the investigators, even though it was corroborated by

another interviewee, seemingly in contravention of the investigator's stated procedures.

Therefore, the court must conclude that, viewing the facts in a light most favorable to, and drawing all reasonable inferences in favor of, the non-movant, questions of fact have been raised under a "cat's paw" theory which would allow a reasonable factfinder to infer that fact issues in the Team Relations Memo were resolved against Shirley on the basis of race, rather than in good faith, and then relied on in the decision to discipline him.

## V. CONCLUSION

For the reasons discussed, the Motion for Summary Judgment (Doc. #13) is due to be and is hereby ORDERED DENIED.

Done this 24th day of May, 2016.

/s/ W. Harold Albritton_____
W.   HAROLD ALBRITTON
SENIOR UNITED STATES DISTRICT JUDGE